1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD GATHENJI,                              CASE NO. CV-F-08-1941 LJO JLT

                Plaintiff,                     **ORDER ON DEFENDANTS' RENEWED SUMMARY JUDGMENT MOTION** (Doc. 78)

        vs.

AUTOZONERS, LLC, and CELINE
RENTERIA,

                Defendants.
_____/

## INTRODUCTION

Defendants Autozoners, LLC. ("Autozone") and Celine Renteria ("Ms. Renteria") (collectively "defendants") move for summary judgment against plaintiff Richard Gathenji ("Mr. Gathenji"). Mr. Gathenji, an Autozone employee, asserts claims against defendants for race and national origin discrimination and defamation. Defendants contend that the uncontroverted evidence establishes that Mr. Gathenji was demoted for legitimate, non-discriminatory reasons and that Mr. Gathenji cannot raise a triable issue of fact as to pretext on his discrimination claims. In addition, defendants argue that Mr. Gathenji's post-demotion discrimination claims fail because none of the treatment complained of constitutes an adverse employment action. Finally, defendants contend that Mr. Gathenji's defamation claim fails because there was no defamatory statement, no publication of a defamatory statement, and any statements were privileged. Mr. Gathenji opposed the motion, arguing that the facts establish that he was discriminated against by Autozone and its agents. For the following reasons, this Court GRANTS in part and DENIES in part defendants' summary judgment motion.

1

## BACKGROUND[1]

Autozone hired Mr. Gathenji, an African American male of Kenyan origin, on October 17, 2003. Mr. Gathenji was promoted to store manager shortly thereafter, on November 23, 2003. Mr. Gathenji worked as a store manager until July 1, 2007, when he was demoted to parts sales manager ("PSM") and transferred to a store managed by Ms. Renteria. Mr. Gathenji's claims arise from his alleged treatment before and after his demotion.

### Mr. Gathenji's Claims

Mr. Gathenji pursues discrimination claims on the basis of race and national origin, pursuant to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, California Fair Employment and Housing Act ("FEHA"). Mr. Gathenji contends that while employed at Autozone, he has been discriminated against, subjected to unwarranted verbal and written reprimands, differential treatment, transfer and demotion. Mr. Gathenji alleges that this treatment began when Rick Torres ("Mr. Torres") became district manager in 2005, and continued with Ms. Rancheria as his store manager. When Mr. Gathenji complained about this treatment to Autozone, the conduct continued, escalated and worsened. In addition to this claims of discrimination, Mr. Gathenji claims that he was defamed by Ms. Renteria.

### Defendants' Motion and Supporting Facts

### Claims Related to Demotion

Defendants argue that Mr. Gathenji's discrimination claims based on his demotion fail because he cannot demonstrate that he performed his job in a satisfactory manner at the time he was demoted. Defendants claim that the undisputed evidence establishes Mr. Gathenji's poor performance, and that the decision to demote him was legitimate. Moreover, defendants contend that Mr. Gathenji cannot raise a triable issue as to pretext. Defendants offer the following facts related to their defense of Mr. Gathenji's claims based on his demotion.

#### *Mr. Gathenji's Responsibilities as Store Manager*

As store manager, Mr. Gathenji was responsible for minimizing inventory losses to theft and

---

[1]The Court relies on the parties' joint statement of undisputed facts and evidence presented by each party for purposes of deciding this motion.

mismanagement.  Mr. Gathenji's responsibilities as an Autozone store manager required him to fill out paperwork on a daily, weekly, and monthly basis and to make daily cash drops into a safe.  In addition, Autozone requires store managers to pass loss prevention audits and prepare loss prevention reports.

A loss prevention audit consists of a pre-printed form that is filled out by the district manager who performs the loss prevention audit.  The loss prevention audit measures the effectiveness of the store's inventory control procedures using a number of objective and subjective factors related to paperwork control, store organization and cleanliness.  The audit metrics included, among others, the store manager's next day review, money safe logs, footprints on the profit and loss statement, and overstock audit.  A loss prevention audit is the means by which Autozone insures that managers are following appropriate loss control procedures.

*Pre-Demotion Corrective Actions and Performance Improvement Plan*

As district manager, beginning in 2005, Mr. Torres was responsible for performing loss prevention audits on Mr. Gathenji.  Mr. Torres managed Mr. Gathenji without incident between August 2005 and August 2006.  Mr. Gathenji received "on track" marks on all categories in his initial performance appraisal in March 2006.  Mr. Gathenji's performance declined, however, in 2006 when Mr. Gathenji began experiencing job performance-related issues.  The parties do not dispute the following documented performance-related issues occurred from October 2006 until the June 2007 demotion:

1.  On October 10, 2006, Mr. Gathenji received a correction action for scoring a 49% (85% is a passing score) on a loss prevention audit for the second consecutive time.

2.  On February 8, 2007, Mr. Gathenji received a corrective action for a loss prevention violation involving failing to secure a $300 money drop (which is a terminable offense).  Mr. Torres searched Mr. Gathenji's store on his hands and knees to find the lost deposit, which e found in a narrow crack by the safe.  Mr. Torres gave Mr. Gathenji a serious violation for this offense.

3.  On February 9, 2007, Mr. Gathenji received a corrective action for receiving a loss prevention audit score of 63%.

4.  On April 20, 2007, Mr. Gathenji received a correction action for receiving a loss

3

1    prevention audit score of 69%.

2    5.    On May 9, 2007, Mr. Gathenji failed a walk-through by the regional manager about

3          whom Mr. Gathenji has no complaint.  As a result of the walk-through, Mr. Gathenji was

4          disciplined on May 11, 2007 for failure to maintain his store merchandise properly.

5    6.    On June 5, 2007, Mr. Gathenji failed his fifth consecutive loss prevention audit.

6    Autozone contends that Mr. Gathenji was demoted because he failed to improve after placement

7    on the performance improvement plan, failed five consecutive audits and a walk-through, and lost a $300

8    cash deposit during this one-year time period.  Defendants explain the timeline of these events as

9    follows:  On March 28, 2007, after failing three audits in a row, Autozone placed Mr. Gathenji on a

10   performance improvement plan.  Autozone gave Mr. Gathenji several dates by which to improve in

11   deficient areas.  Mr. Gathenji again failed his audit in April 2007.  After failing for consecutive audits,

12   Mr. Gathenji then failed the walk-through performed by the regional manager.  Mr. Gathenji failed one

13   more audit after the walk-through.  Mr. Gathenji was demoted on June 21, 2007.

14            *Mr. Gathenji's Real Estate Development and Property Management*

15   Defendants contend that Mr. Gathenji's performance as store manager began to decline during

16   the time that he was developing his rental properties. The facts related to his property business are

17   undisputed.  Mr. Gathenji and his wife maintained a side business in real estate development and

18   property management since 2001.  Mr. Gathenji acquired his first rental property in 2001 and another

19   in March 2003.  Mr. Gathenji took an active role in renting and maintaining both of these properties.

20   In 2006, Mr. Gathenji expended his operations to include real estate development.  Mr. Gathenji bought

21   his first parcel in April 2006 and a second in September 2006.  Mr. Gathenji anticipated developing the

22   same duplex on both properties and had the architectural plans drawn up at the tame time.  In February

23   2007, construction began on these properties.  Mr. Gathenji played an active role in the process and

24   completed a significant amount of the interior work himself.  Mr. Gathenji also dealt with the inspectors

25   and addressed code issues.  Construction for one duplex was completed in December 2007.  Five months

26   after completing construction on that duplex, Mr. Gathenji bought his latest rental.

27            **Post-demotion Discrimination Claims**

28   Mr. Gathenji alleges that the discrimination against him continued after he was demoted.

4

Specifically, Mr. Gathenji alleged that Ms. Renteria discriminated against him by:

1. Giving him far more Saturday closing shifts than other PSMs;

2. Requiring him to clean windows every two weeks, whereas no other employee was required to do the same;

3. Requiring him to clean the outside store windows in the middle of the day in the summer heat amidst unbearable temperatures and not permitting him to conduct his window cleaning assignment in the morning or evening hours when the temperatures were milder. No other employees were required to clean the windows at midday.

4. Not informing Mr. Gathenji about the Autozone ASE Pretest, but informing other employees;

5. Not providing Mr. Gathenji with the day off to take the official ASE exam;

6. Not providing Mr. Gathenji with training regarding the inventory matrix and overstock system;

7. Giving Mr. Gathenji a point after falling asleep in his car and failing to return from lunch on time;

8. Falsely marking Mr. Gathenji's as "unexcused" rather than "sick" on his attendance sheet when he left work to visit the doctor;

9. Scoring Mr. Gathenji harsher on his performance reviews;

10. Accusing Mr. Gathenji of forging documents in front of others; and

11. Accusing Mr. Gathenji of sexually harassing Ms. Renteria.

Defendants argue that none of the actions Mr. Gathenji complains of constitutes "adverse employment decisions" and were made for legitimate reasons.

*Saturday Shifts*

Mr. Gathenji contends that he was assigned more than his share of closing shifts on Saturdays. Defendants contend that there was a legitimate reason for the assignments, and that Mr. Gathenji worked no more closing shifts and no more Saturday shifts than any other manager. In fact, defendants submit that Mr. Gathenji worked the least amount of Saturday and closing shifts of any of the managers, including Ms. Renteria.

A PSM is part of the store's management team and shares responsibilities for open and closing shifts.  Mr. Gathenji was one of four PSMs at the store.  The other PSMs were Sue Kniffen ("Ms. Kniffen"), Aisha Dulan ("Ms. Dulan"), and Eduardo Mota ("Mr. Mota").  All were responsible to work closing shifts, including on Saturdays.

Although she was a PSM, Ms. Kniffen was on "injury time" from April 2009 through March 2010.  Injury time is a type of light duty offered to employees on worker's compensation.  Ms. Kniffen could not be the manager on duty when she worked during this injury time period.

Defendants present evidence that the other available managers, Ms. Renteria, Mr. Mota and Ms. Mula, worked a greater percentage of closing shifts than Mr. Gathenji.  A summary of that evidence is presented in this table:

| Manager | Weeks Worked | Closing Shifts Worked | Percent of Total Shifts Closing |
|---|---|---|---|
| Ms. Renteria | 42 | 14 | 6% |
| Mr. Gathenji | 42 | 124 | 63% |
| Ms. Dulan | 13 | 41 | 72% |
| Mr. Mota | 32 | 105 | 67% |

Similarly, defendants contend that all managers worked on Saturdays and that Mr. Gathenji worked the least amount of Saturdays of all of the managers.  That evidence supports the following:

| Manager | Weeks Worked | Saturdays Worked | Percentage of Total Saturdays Worked |
|---|---|---|---|
| Ms. Renteria | 42 | 34 | 81% |
| Mr. Gathenji | 42 | 25 | 60% |
| Ms. Dulan | 13 | 9 | 69% |
| Mr. Mota | 32 | 20 | 63% |

*Window Cleaning*

Mr. Gathenji alleges that he was asked to clean windows once every two weeks and was forced to clean windows during the hottest time of the day in the summer months.  Defendants submit evidence to support the position that all the PSMs cleaned the windows at least once every two weeks.  Moreover,

6

1   Mr. Mota and Reimundo Lopez ("Mr. Lopez"), two other employees who worked at Mr. Gathenji's

2   store, declare that they sometimes cleaned windows during the midday summer heat, too.

3                                              *ASE Test*

4        Mr. Gathenji alleges that Ms. Renteria discriminated against him because she failed to inform

5   Mr. Gathenji about the Autozone ASE Pretest, but informed other employees.  In addition, Mr. Gathenji

6   alleges that she failed to provide Mr. Gathenji with the day off to take the official ASE exam.

7        The ASE exam is given by the National Institute of Automotive Service Excellence, which

8   provides testing and certification to automotive professionals.  Information about the ASE test–an exam

9   unrelated to Autozone–is available freely and publicly on the internet.  Defendants submit evidence that

10  Ms. Renteria received information about an upcoming ASE testing and posted it on the bulletin board

11  for everyone to see.  She made no special effort to tell anyone about it.  All employees were free to ask

12  Ms. Renteria about the ASE test.  While some did speak with Ms. Renteria about the ASE test, Mr.

13  Gathenji did not.

14       Ms. Renteria first learned that Mr. Gathenji intended to take the ASE test when he asked her for

15  the day off.  Mr. Gathenji's request was made at the last minute and required Ms. Renteria to rearrange

16  the schedule.  Nevertheless, Ms. Renteria granted Mr. Gathenji's request for time off.  Moreover, even

17  if Mr. Gathenji did not receive time off for that particular test day, he could have rescheduled the date

18  for at time when he was available.

19                            *Training on the Inventory and Overstock System*

20       Mr. Gathenji alleges that Ms. Renteria discriminated against him by not providing him with

21  training regarding the inventory matrix and overstock system.  Defendants submit that Autozone does

22  not provide training on the inventory matrix and the overstock system to any employee other than store

23  managers.  Ms. Renteria did not train any of the PSMs in Mr. Gathenji's store on those systems.

24                                            *Tardy Points*

25       Mr. Gathenji complains that Ms. Renteria gave him an attendance  point after falling asleep in

26  his car and failing to return from lunch on time.  Defendants submit that Autozone maintains an

27  attendance policy in which employees receive an attendance point for being tardy.  Defendants admit

28  that Mr. Gathenji received an attendance point for being tardy the day he feel asleep in his car while on

                                                 7

a break.  Defendants submit that Mr. Mota and Michael Hobson ("Mr. Hobson") also received attendance points for being tardy, as do all Autozone employees.  Moreover, Mr. Mota and Mr. Hobson received formal write-ups for attendance violations.

*Excused Absence and Performance Reviews*

Ms. Renteria disputed that she changed Mr. Gathenji's absences or reviewed him unfairly.  Ms. Renteria declares that  she never changed Mr. Gathenji's excused absence to an unexcused absence.  In addition, Ms. Renteria contends that she reviewed Mr. Gathenji fairly.

**Defamation Claims**

*Forgery Allegation*

Mr. Gathenji also asserts a defamation claim against Ms. Renteria for allegedly accusing Mr. Gathenji of forgery.  As part of the procedure to open the store, a manager checks the store's alarm system by waving an item with an anti-theft magnet in front of the sensor.  The alarm sound and procedure a three digit code.  The manager writes this code in a folder.  On one occasion, Mr. Gathenji was unable to locate the folder while he performed the opening procedure.  Rather than write the three-digit code in the folder, Mr. Gathenji wrote the code on the "opening manager's checklist."  A few days later, when Mr. Gathenji located the folder, he copied the code into it.

Mr. Gathenji alleges that Ms. Renteria, upon discovering the newly-written code, called out to Mr. Gathenji and asked, "Why are you forging stuff?"  Mr. Gathenji believes that two of his co-workers, Susan Kniffen ("Ms. Kniffen") and Eduardo Mota ("Mr. Mota") overheard this statement.  Defendants point out that both of these co-workers deny hearing the statement.

*Sexual Harassment Allegation*

Defendants submit that Mr. Gathenji spread gossip about Ms. Renteria.  Mr. Gathenji's co-workers, Ms. Kniffen, Reimundo Lopez ("Mr. Lopez") and Orlando Irizzary ("Mr. Irizzary"), informed Ms. Renteria that Mr. Gathenji had initiated inappropriate discussions concerning whether Ms. Renteria was involved romantically with Mr. Mota.  Ms. Renteria informed Connie Cuellar ("Ms. Cuellar") of Autzone's human resources department of the matter and asked Ms. Cuellar to look into it.  Mr. Gathenji denied having the conversation with Ms. Kniffen, Mr. Lopez and Mr. Irizzary.  Ms. Cuellar reviewed the company policy concerning gossip with Mr. Gathenji, but did not discipline him.

1

## Mr. Gathenji's Opposition and Related Facts

2      Mr. Gathenji maintains that he has established a prima facie case for his discrimination claims,

3 provides evidence of pretext, and raises material issues of fact as to his defamation claims. Mr. Gathenji

4 opposes defendants' motion by offering the following additional facts.

5                                **Demotion Discrimination Claims**

6      Mr. Gathenji submits that he was a valued member of Autozone's organization until Mr. Torres

7 became his district manager. Almost immediately thereafter, Mr. Torres subjected him to discriminatory

8 and harassing treatment based on Mr. Gathenji's race and national origin.  The Court provides a

9 summary of Mr. Gathenji's allegations, testimony, and declarations regarding his treatment while a store

10 manager by his district manager Mr. Torres.

11      Mr. Gathenji contends that Mr. Torres treated him differently from other store managers on his

12 loss prevention audits and reports. Mr. Gathenji testified that Mr. Torres would audit other stores every

13 90 days or every 60 days, but he audited Mr. Gathenji's store every month.  In addition, Mr. Torres'

14 audit of Mr. Gathenji's store would be unannounced, whereas Mr. Torres called to forewarn other store

15 managers, including Mr. Fonseca and Mr. Martin, that he would visit the store for a loss prevention

16 audit.  Mr. Torres' phone calls allowed Phillip Fonseca ("Mr. Fonseca")  and Martin Gonzalez ("Mr.

17 Gonzalez") to prepare the store for the audit.  Mr. Torres also called Sandra Fonseca to give notice of

18 his audit. Mr. Gathenji never received a phone call from Mr. Torres prior to an audit.

19      According to Mr. Gathenji, Mr. Torres penalized him for initialing, rather than signing, his

20 Manager's Same Day Report.  Mr. Torres allowed other managers who were Hispanic, including Mr.

21 Fonseca and Mr. Gonzalez, to initial the form without incident or disciplinary action.  Mr. Torres

22 penalized Mr. Gathenji if his weekly recaps were incomplete or not up-to-date.  Mr. Torres signed off

23 on other managers' weekly recap reports, however, even when they were incomplete or insufficient.

24 Moreover, Mr. Torres would work with other store managers to fix their audits before signing off on

25 them and asked other store managers to doctor the results to receive a passing score.  Mr. Torres never

26 extended this courtesy to Mr. Gathenji.

27      Mr. Gathenji claims that Mr. Torres also pre-informed multiple district managers that regional

28 district manager Phil Lester would be visiting the region for a check-up.  Mr. Gathenji reports that all

9

1    of the store managers he spoke to told him that Mr. Torres gave them advanced notice that Mr. Lester

2    would be coming to the district.  Mr. Gathenji received no such notice.

3        Mr. Gathenji claims that he was treated differently with regard to completing the inventory

4    matrix.  Generally, Mr. Torres allowed any member of management to complete the inventory matrix,

5    including assistant managers.  As such, Keith Huchason ("Mr. Huchason"), an assistant manager who

6    worked under Mr. Hernandez, was allowed by Mr. Torres to complete the inventory matrix for Mr.

7    Hernandez. When Mr. Huchason was employed under Mr. Gathenji, however, Mr. Torres required Mr.

8    Gathenji to complete the inventory matrix.   Mr. Torres never allowed Mr. Huchason to complete the

9    inventory matrix for Mr. Gathenji.

10       Mr. Torres never excused Mr. Gathenji from attending meetings.  Mr. Gathenji was required to

11   attend management meetings and request permission to leave early to pick up his daughter.  When he

12   did request, Mr. Torres did not grant Mr. Gathenji permission to leave early to pick up his daughter from

13   day care.  In contrast, Mr. Torres excused other store managers from attending the management

14   meetings. David Hernandez ("Mr. Hernandez") never attended personally a management meeting from

15   2006 through June 2007.  Sometimes, Mr. Hernandez would appear telephonically to these meetings,

16   but his attendance was irregular.  Mr. Torres also excused Mr. Fonseca and Mr. Gonzales from attending

17   management meetings.

18       Mr. Torres made a "nasty comment" about Mr. Gathenji's family photograph to Mr. Gathenji's

19   assistant, Ashley Davis ("Ms. Davis").  Ms. Davis refused to tell Mr. Gathenji the substance of the nasty

20   comment.  Mr. Gathenji took his family photograph home after Mr. Torres made the nasty comment.

21                                      **Post-demotion Complaints**

22       After Mr. Gathenji was demoted, Mr. Gathenji complained to Autozone's Employee Relations

23   Department and Regional Sales Manger about his treatment.  Mr. Gathenji pointed out that other

24   managers with performance issues–including those with significantly lower performance standards–were

25   not demoted, while Mr. Gathenji was.  Mr. Gathenji's complaints were dismissed without action, and

26   Mr. Gathenji remained demoted.

27                                 **Post-Demotion Discrimination Claims**

28       Mr. Gathenji alleges that the discrimination against him continued after he was demoted.  The

Court set forth the specific allegations above.  Mr. Gathenji presents no further evidence on these allegations in opposition to defendants' summary judgment motion.

### Former Autozone Employees Confirm Discrimination and Discriminatory Intent[2]

Mr. Gathenji submits that six former Autozone employees agree with his discrimination claims. In addition, Mr. Gathenji suggests that the declarations of these former employees establish defendants' discriminatory intent and pretext.  The former employees declare as follows:

*Joseph DeLeon*

Joseph DeLeon ("Mr. DeLeon") worked for Autozone as an Assistant PSM from 2003 through 2007.  He regularly worked the same shifts as Mr. Gathenji and was present to observe Mr. Torres' interaction with Mr. Gathenji.  Mr. DeLeon testified that Mr. Torres disfavored employees who were not of Latin descent or heritage and who did not speak Spanish.  Mr. DeLeon witnessed Mr. Torres treat Mr. Gathenji unfairly on a regular basis, communicating with a mean-spirited tone, and refusing to provide appropriate employee support.  Mr. DeLeon further testified that he personally believed that Mr. Torres treated Mr. Gathenji poorly because he is African-American and spoke with a Nigerian accent.

*Jerry Jordan*

Jerry Jordan ("Mr. Jordan") was a certified mechanic who worked at Autozone as a cashier from approximately June 2006 through May 2007.  Mr. Jordan witnessed Mr. Torres treat Mr. Gathenji differently than other managers and employees by overly-scrutinizing his job performance and constantly criticizing him unfairly.  Mr. Jordan also witnessed Mr. Torres belittle and attack Mr. Gathenji, despite the fact that Mr. Gathenji was a good manager.  Mr. Jordan regularly worked the same shifts as Mr. Gathenji, but never witnessed Mr. Gathenji engaged in personal telephone calls or focus on matters outside the scope of his management duties, including his rental property projects.

---

[2]Defendants object to these declarations on a number of grounds, arguing that each is either inadmissible or irrelevant or that the declarant lacks personal knowledge as to the substance of his or her statements. This Court carefully reviewed and considered all evidence, arguments, points and authorities, declarations, testimony, statements of disputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does not rule on objections in a summary judgment context, unless otherwise noted.  To the extent this Court relies on evidence to which a party objects, that party may renew its objection in a motion in limine, if warranted.

*Nick Peraza*

Nick Peraza ("Mr. Peraza") worked for Autozone as a PSM from May 2003 through December 2005. Mr. Peraza worked under Mr. Torres' supervision from 2004 until 2005. Mr. Peraza witnessed Mr. Torres correct and complete audit paperwork for Ms. Fonseca and Mr. Hernandez, store managers, in order for them to receive a passing score. At no time did Mr. Peraza see Mr. Torres do the same for Mr. Gathenji. Mr. Peraza saw and heard Mr. Torres call certain managers to warn them of upcoming audits, including Mr. Fonseca. At no time did Mr. Peraza witness Mr. Torres make a warning telephone call to Mr. Gathenji.

*Keith Hutchason*

Keith Hutchason ("Mr. Hutchason") worked for Autozone as an assistant manager from 2006 through 2008. Mr. Hutchason worked as an assistant manager for Mr. Hernandez for a few months, then worked as Mr. Gathenji's assistant manager when he was store manager. Mr. Hutchason noticed a significant difference in Mr. Torres' behavior toward each store manager. Specifically, Mr. Gathenji was held to a higher standard by Mr. Torres than was Mr. Hernandez. Mr. Torres allowed Mr. Hutchason to complete Mr. Hernandez' audit paperwork, but would not allow Mr. Hutchason to complete the paperwork for Mr. Gathenji. Similarly, Mr. Torres allowed any member of management, including assistant managers to complete the inventory matrix while Mr. Hutchason worked in the store managed by Mr. Hernandez; however, Mr. Torres required Mr. Gathenji to complete the inventory matrix alone. Mr. Hutchason was aware that Mr. Gathenji's store had clear growth according to the published monthly/quarterly report. Nevertheless, Mr. Torres demoted Mr. Gathenji for "lack of store growth."

*Sandra Fonseca*

Ms. Fonseca is a former Autozone store manager who observed Mr. Torres violate company policy. On several occasions, Mr. Torres called Ms. Fonseca in advance of a store audit to inform her of an upcoming audit. On several occasions when her loss prevention audit was not up to par, Mr. Torres doctored the audits to reflect a passing score. Ms. Fonseca witnessed Mr. Torres "verbally abuse" Mr. Gathenji. Specifically, at management meetings with all other store managers, Mr. Torres would belittle Mr. Gathenji by telling him that he was too slow and that his sales were not good. Ms. Fonseca

12

1   witnessed Mr. Torres speak to Mr. Gathenji in a condescending manner if Mr. Gathenji asked a question.

2   *George Campos*

3   George Campos ("Mr. Campos") is a former Autozone store manager.  On several occasions,

4   Mr. Campos witnessed Mr. Torres criticize Mr. Gathenji unfairly.  During store manager meetings, Mr.

5   Torres would belittle and criticize Mr. Gathenji.  Other store managers, with fewer sales, were never

6   belittled this way.  Additionally, when Mr. Torres would come into Mr. Campos' store, Mr. Torres

7   would tell him to doctor and fix the audit to reflect that the job was done when it was not.  As such, Mr.

8   Torres forced Mr. Campos to fix the audits to receive a passing score.

9   **Racial Slurs**

10  Mr. Gathenji contends that Ms. Renteria used the "N word" on numerous occasions when

11  referring to him.  Mr. Gathenji argues that Mr. Hobson witnessed Ms. Renteria refer to Mr. Gathenji

12  numerous times using the "N word," and that she made comments that she was a "white girl" who had

13  to work with minorities like "Mexicans."

14  **Defendants' Reply**

15  Defendants point out that Mr. Gathenji erroneously attributes the use of the "N word" to Ms.

16  Renteria.  In fact, Mr. Hobson testified that Ms. Kniffen, not Ms. Renteria, used the "N word" on two

17  or three occasions when referring to Mr. Gathenji.  Ms. Kniffen, who is Caucasian, mentioned that "she

18  was just a white girl" and "she would work with Mexicans and stuff."  Defendants note that Ms. Renteria

19  is Hispanic.  Moreover, defendants point out that Autozone has a strict policy forbidding the use of racial

20  slurs by an employee.  Additionally, defendants note that Mr. Gathenji was unaware of the alleged racial

21  slur of his co-worker until Mr. Hobson's deposition testimony.

22  Defendants contend that Mr. Gathenji fails to rebut defendants' evidence that he did not perform

23  his job in a satisfactory manner and that the undisputed evidence establishes that Mr. Gathenji was

24  demoted for a legitimate, non-discriminatory reason.

25  **Procedural History**

26  Mr. Gathenji initiated this action on December 19, 2008.  Mr. Gathenji originally pursued ten

27  claims against Autozone and Mr. Torres.  Defendants moved for summary judgment on those claims on

28  December 18, 2009.  In its March 9, 2010 order, this Court granted in part and denied in part defendants'

summary judgment motion.  Specifically, this Court granted judgment in favor of defendants on Mr. Gathenji's claims for harassment, retaliation, failure to prevent, and punitive damages.  In addition, this Court granted summary judgment in favor of defendants on all claims against Mr. Torres.  The Court denied summary adjudication on all other claims.

Mr. Gathenji filed a supplemental, second amended complaint on June 10, 2010.  The second amended complaint alleged seven causes of action:

1.   Race Discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII");

2.   National Origin Discrimination in Violation of Title VII;

3.   Race Discrimination in Violation of 42 U.S.C. §1981 (Civil Right Act of 1866);

4.   Race Discrimination in Violation of California Government Code section 12940 et seq. (FEHA);

5.   National Origin Discrimination in Violation of FEHA;

6.   Failure to Prevent Discrimination in Violation of FEHA; and

7.   Defamation.

Mr. Gathenji named Ms. Rancheria as a defendant in the second amended complaint.

Defendants moved for summary judgment against Mr. Gathenji again on March 28, 2011.  Mr. Gathenji opposed the motion on April 11, 2011.  Defendants responded onApril 25, 2011.  This Court found this motion suitable for a decision without a hearing, vacated the May 2, 2011 hearing on this motion pursuant to Local Rule 230(g) and issues the following order.

### STANDARD OF REVIEW

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving

14

party bears the burden of proof at trial. *Id*. at 322. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor, but "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial." "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

### DISCUSSION

### Federal and State Discrimination Standards

Mr. Gathenji asserts multiple federal and state discrimination claims: (1) race discrimination in violation of Title VII (first cause of action); (2) national origin discrimination in violation of Title VII (second cause of action); (3) race discrimination in violation of 42 U.S.C. §1981 (third cause of action)[3];

---

[3] The parties' arguments focus on Mr. Gathenji's Title VII and FEHA claims; neither party discussed Mr. Gathenji's Civil Rights Act of 1866, 42 U.S.C. §1981 claim. Having failed to discuss the law on this claim, and because the court evaluates 42 U.S.C. §1981 claims the same as Title VII claims, *Manatt v. Bank of America,* 339 F.3d 792 (9th Cir. 2003),

(4) race discrimination in violation of California's FEHA (fourth cause of action); and (5) national origin discrimination in violation of FEHA (fifth cause of action). Both Title VII and FEHA prohibit discrimination against individuals in the workplace on the basis of race and national origin. 42 U.S.C. §2000e-2; Cal. Gov. Code §§12940(a)-(d). In addition, both federal and California courts analyze indirect or circumstantial discrimination claims under the shifting burden of proof framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), and reaffirmed in *St Mary's Honor Center v. Hicks & Co.*, 509 U.S. 502, 113 S.Ct. 2742(1993). *See*, *Caldwell v. Paramount Uni. Sch. Distr.*, 41 Cal. App. 4th 189, 200 (1995) (applying a *McDonnell Douglas* analysis to discrimination under California's FEHA); *Mixon v. Fair Employment and Housing Comm'n*., 192 Cal. App. 3d 1306, 1316 (1987) ("While the California act and title VII differ in some particulars, their objectives are identical, and California courts have relied upon federal law to interpret analogous provisions of the state statute.")

Under the burden-shifting framework of Title VII and FEHA, Mr. Gathenji must establish a prima facie case of discrimination in the workplace by demonstrating that he: (1) was a member of a protected class; (2) performed his job in a competent manner; (3) suffered an adverse employment action; and (4) the action occurred under circumstances suggesting discriminatory motive (i.e. person outside of the protected class was treated more favorably). *McDonnell Douglas*, 411 U.S. at 802; *Nidds v. Schindler Elevator Corp*., 113 F.3d 912, 917 (9th Cir. 1996), *cert. denied*, 118 S.Ct. 369 (1997); *Caldwell*, 41 Cal. App. 4th at 200; *Mixon*, 192 Cal. App. 3d at 1319 (applying *McDonnell Douglas* factors).

If Mr. Gathenji establishes his prima facie case, the burden shifts to Autozone to rebut the presumption of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Autozone may rebut the presumption by producing evidence of a legitimate, non-discriminatory reason for its actions. *Id*.; *Nidds*, 113 F.3d at 917. This burden of production is less than the burden of proving the absence of a discriminatory motive, since the burden of proving the cases rests with Mr. Gathenji. *Nidds*, 113 F.3d at 916-17; *Clark v. Claremont University Center*, 6 Cal. App. 4th 639, 663-64 (1992).

defendants failed to establish that they are entitled to judgment as a matter of law on Mr. Gathenji's third cause of action.

1    If Autozone meets its burden, the presumption of discrimination raised by the prima facie case

2   "simply drops out of the picture." *St. Mary's*, 113 S.Ct. at 2747.  The burden shifts back to Mr. Gathenji

3   to establish that Autozone's stated reasons for the adverse employment action was pretext for unlawful

4   discrimination. *Id.*; *Bradley v. Harcourt, Brace, and Co.*, 104 F.3d 267, 270 (1996).  Mr. Gathenji must

5   provide "specific, substantial evidence" that the reasons given were a pretext for discrimination. *Bradley*,

6   104 F.3d at 270.   Mr. Gathenji may establish pretext if there is an absence of documentation confirming

7   the employer's employment decisions. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1123 (9th Cir.

8   2004). In addition, Mr. Gathenji must provide evidence that his protected class "actually played a role"

9   and "had a determinative influence" on his demotion. *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993);

10   *Mixon*, 192 Cal. App. 3d 1306, 1317 (1987) (plaintiff must prove that there was a "causal connection"

11   between the protected status and the adverse employment decision).   Ultimately, at this stage, the

12   "factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated

13   against plaintiff." *Mixon*, 192 Cal. App. 3d at 1319 (citing *U.S. Postal Service Bd. of Govs. v. Aikens*,

14   460 U.S. 711, 715, 103 S.Ct. 1478 (1983)).  "In short the trier of fact decides whether it believes the

15   employer's explanation of its actions or the employee's." *Id.*

16    "A defendant employer's motion for summary judgment slightly modifies the order of these

17   [McDonnell Douglas] showings." *Aguilar v. Atlantic Richfield*, 25 Cal. 4th 826, 850 (2001).   In this

18   motion, defendants bear "the initial burden to either (1) negate an essential element of plaintiff's prima

19   facie case or (2) establish a legitimate, nondiscriminatory reason for terminating plaintiff.  *Scotch v. Art*

20   *Institute of Cal.*, 173 Cal. App. 4th 989,1005 (2009).  "To avoid summary judgment [once the employer

21   makes the foregoing showing], an employee claiming discrimination must offer substantial evidence that

22   the employer's stated nondiscriminatory reason for the adverse action was untrue or pretexual, or

23   evidence the employer acted with a discriminatory animus, or a combination of the two, such that a

24   reasonable trier of fact could conclude the employer engaged in intentional discrimination." *Hersant v.*

25   *Dept. of Social Servs.*, 57 Cal. App. 4th 994, 1004-05 (1997).

26                                  **Claims Based on Discriminatory Demotion**

27    Mr. Gathenji establishes two elements of his prima facie case of discrimination based on his

28   demotion–that he was a member of a protected class and that he suffered an adverse employment action.

1    Mr. Gathenji undisputedly is a member of a protected class under the definitions of both race and

2    national origin. "Race" is interpreted broadly to mean classes of persons identifiable because of their

3    ancestry or ethnic characteristics. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 612-13 (1987).

4    "National origin" is defined as the country where a person was born, or, more broadly, the country from

5    which the plaintiff's ancestors came. *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88-89 (1973).

6    National origin discrimination includes the denial of equal employment opportunities because of an

7    individual's actual or ancestral place of origin. 29 C.F.R. §1606.1. Mr. Gathenji is an African American

8    man who is of Kenyan national origin. Accordingly, Mr. Gathenji was a member of a protected class

9    for purposes of race discrimination and national origin discrimination. In addition, Autozone

10   undisputedly demoted Mr. Gathenji from store manager to parts sales manager. To establish this

11   element, Mr. Gathenji must show a "materially adverse change in the terms or conditions of employment

12   because of the employer's actions." *Michael v. Caterpillar Fin'l Servs. Corp.*, 496 F.3d 584, 593 (6th

13   Cir. 2007). Demotion is an example of an adverse employment action. *Id*. Because Mr. Torres demoted

14   Mr. Gathenji, Mr. Gathenji establishes that he experienced an adverse employment.

15                        **Legitimate Reason for Adverse Employment Action**

16          Defendants argue that Mr. Gathenji cannot establish his prima facie case of discriminatory

17   demotion because he cannot demonstrate that he was performing his job in a satisfactory manner at the

18   time he was demoted. Moreover, defendants contend that the undisputed evidence establishes a

19   legitimate, nondiscriminatory reason for Mr. Gathenji's demotion. Specifically, defendants point out

20   that Mr. Gathenji failed to make a $300 cash deposit, forcing Torres to search his store on his hands and

21   knees to find the lost deposit (a terminable offense); Mr. Gathenji failed a walk-through by the regional

22   manager about whom Plaintiff has no complaint; Mr. Gathenji failed five consecutive loss prevention

23   audits; and Mr. Gathenji's job performance failed to improve after he was placed on the performance

24   improvement plan.

25          Mr. Gathenji argues that he performed his duties competently and professionally while employed

26   at Autozone. Mr. Gathenji contends that for years, Mr. Gathenji worked as an Autozone store manager

27   without incident. According to Mr. Gathenji, he had no alleged performance issues until Mr. Torres

28   became the district manager. Mr. Gathenji acknowledges that corrective actions were taken against him

                                                        18

1  before he was demoted, but contends that Mr. Torres unfairly scored his loss prevention audits. A store

2  manager's loss prevention performance is measured by the district manager who performs the loss

3  prevention audit. Thus, Mr. Gathenji argues that he failed his loss prevention audits based on Mr.

4  Torres' discriminatory actions, not because of his poor performance.

5      Having considered the parties' arguments, the evidence submitted, and the relevant case law, this

6  Court finds that Autozone satisfies its initial burden by establishing a legitimate, nondiscriminatory

7  reason for Mr. Gathenji's demotion. *See, Scotch*, 173 Cal. App. 4th at 1005. Mr. Gathenji does not

8  dispute that he lost the $300 safe deposit or that the loss of that deposit was a terminable offense.

9  Additionally, Mr. Gathenji does not dispute that he failed the walk-through by the regional manager.

10 The walk-through was performed by a person about whom Mr. Gathenji has no complaint. That is, Mr.

11 Gathenji failed an objective audit performed by someone who is not alleged to have discriminated

12 against him. Defendants placed Mr. Gathenji on a performance improvement plan to give him additional

13 time to improve. Mr. Gathenji was demoted after he continued to fail his loss prevention audits after

14 being placed on the performance improvement plan. Mr. Gathenji does not oppose meaningfully

15 defendants' contention that based on the evidence, defendants carry their burden to establish that Mr.

16 Gathenji was demoted for a legitimate business purpose based on his poor performance. Mr. Gathenji's

17 arguments do not establish that he was performing his job in a satisfactory manner, in light of the

18 undisputed evidence of the terminable offense, failed walk-through, and consistent failures of the audits.

19 Based on these facts, Autozone establishes a legitimate reason for Mr. Gathenji's demotion.

20                                              **Pretext**

21     Because Autozone established a legitimate reason for the demotion, the burden shifts to Mr.

22 Gathenji to establish that Autozone's stated reasons for the adverse employment action was pretext for

23 unlawful discrimination. *Bradley*, 104 F.3d at 270. "To avoid summary judgment ...an employee

24 claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory

25 reason for the adverse action was untrue or pretexual, or evidence the employer acted with a

26 discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude

27 the employer engaged in intentional discrimination." *Hersant*, 57 Cal. App. 4th at 1004-05. Mr. Gathenji

28 may establish "pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation

1    is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly,

2    by showing that unlawful discrimination more likely motivated the employer." *Chuang*, 225 F.3d at

3    1127 (citing *Godwin v. Hung Wesson, Inc.*, 150 F.3d 1217,1220-21 (9th Cir. 1998)).   Mr. Gathenji must

4    provide "specific, substantial evidence" that the reasons given were a pretext for discrimination. *Bradley*,

5    104 F.3d at 270.   In addition, Mr. Gathenji must establish that there was a causal connection between

6    his protected status and the adverse employment action. *Mixon*, 192 Cal. App. 3d at 1317.

7        To oppose this motion, Mr. Gathenji need only show that the "claimed factual dispute be shown

8    to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National*

9    *Bank of Arizona*, 391 U.S.  at 290.   At this stage, Mr. Gathenji must  "go beyond the pleadings ...[to]

10   designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.   "A

11   disparate treatment plaintiff can survive summary judgment without producing any evidence beyond that

12   constituting his prima facie case, if that evidence raises a general issue of material fact regarding the

13   truth of the employer's proffered reasons." *Chang*, 225 F.3d at 1127 (citing *Reeves v. Sanderson*

14   *Plumbing Prods., Inc.*, 530 U.S. 133 (2000)).   If Mr. Gathenji demonstrates through specific evidence

15   that a genuine issue of material fact exists, defendants' summary judgment motion must be denied.

16       Mr. Gathenji establishes that a genuine issue of material fact exists as to pretext of his demotion.

17   Mr. Gathenji has shown through deposition and declarations that store managers not in Mr. Gathenji's

18   protected class had the same sort of performance issues (failure to sign documents, overstock

19   disorganization, incomplete paperwork), yet were not demoted.   Mr. Gathenji raises issues of material

20   fact as to whether Mr. Torres scored Mr. Gathenji's loss prevention audits similarly to how he scored

21   the loss prevention audits of those not in Mr. Gathenji's protected class, suggesting pretext for the

22   demotion.   Mr. Gathenji has presented evidence that "others not in [his] protected class were treated

23   more favorably." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993).   As set forth above, Mr.

24   Gathenji presents evidence that other district managers who were not African-American or of Kenyan

25   origin (he was the only store manager who was African-American and of Kenyan ethnic origin) were

26   treated more favorably.   According to Mr. Gathenji's evidence, Mr. Torres scored the audits of other

27   store audits more favorably.   Mr. Gathenji also presents evidence that Mr. Torres held Mr. Gathenji to

28   a higher standard for orderliness.   In addition, Mr. Torres treated Mr. Gathenji differently on staffing

1    issues and refused to excuse Mr. Gathenji from attending management meetings.  Defendants dispute

2    Mr. Gathenji's evidence; however, in a summary judgment motion for discrimination, the Court must

3    evaluate the facts in a light most favorable to the plaintiff and must resolve factual disputes in favor of

4    the non-moving party. *Chuang v. University of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1124

5    (9th Cir. 2000).

6         To resolve discrimination claims at this stage, the "factfinder must decide upon all of the

7    evidence before it whether defendant intentionally discriminated against plaintiff." *Mixon*, 192 Cal. App.

8    3d at 1319.  The trier of fact at trial must determine "whether it believes the employer's explanation of

9    its actions or the employee's." *Mixon*, 192 Cal. App. 3d at 1319.  In a Fed. R. Civ. P. 56 motion,

10   however, this Court does not resolve factual issues. *Chuang*, 225 F.3d at 1124 (ultimate question of

11   employment discrimination is conducted most appropriately by a factfinder, not on summary judgment).

12   Because Mr. Gathenji presents evidence to oppose Autozone's explanation for his demotion, Mr.

13   Gathenji has satisfied his burden to establish that a question of material fact exists as to these claims.

14    Accordingly, defendants' summary judgment motion is denied to the extend that Mr. Gathenji's

15   discrimination claims rely on allegations related to his demotion and his treatment by Mr. Torres.

16                              **Post-Demotion Discrimination Claims**

17        Mr. Gathenji alleges that the discrimination against him continued after he was demoted under

18   Ms. Renteria.  Specifically, Mr. Gathenji alleges that Ms. Renteria discriminated against him by: 1.

19   giving him far more Saturday closing shifts than other PSMs; 2.  requiring him to clean windows every

20   two weeks, whereas no other employee was required to do the same; 3.  requiring him to clean the

21   outside windows outside store windows in the middle of the day in the summer heat amidst unbearable

22   temperatures and not permitting him to conduct his window cleaning assignment in the morning or

23   evening hours when the temperatures were milder.  No other employees were required to clean the

24   windows at midday.; 4.  not informing him about the Autozone ASE Pretest, but informing other

25   employees;  5.  not providing Mr. Gathenji with the day off to take the official ASE exam;  6.  not

26   providing him with training regarding the inventory matrix and overstock system; 7.  giving him a point

27   after falling asleep in his car and failing to return from lunch on time;  8. falsely marking him as

28   "unexcused" rather than "sick" on his attendance sheet when he left work to visit the doctor;  9.  scoring

1   him harsher on his performance reviews; 10. accusing him of forging documents in front of others; and

2   11. accusing him of sexually harassing Ms. Renteria.  Mr. Gathenji's discrimination claims based on

3   allegations that occurred after he was demoted fail for the following reasons.

4   **Adverse Employment Actions**

5   Defendants argue that none of the actions Mr. Gathenji complains of constitutes "adverse

6   employment decisions."  To constitute an "adverse employment action," an employee must be subjected

7   to an action that "materially affects the terms, conditions, or privileges of employment." *McRae v. Dept.*

8   *of Corrections and Rehabilitiation*, 142 Cal. App. 4th 377, 386 (2006).  Common examples of adverse

9   employment decisions are discharge, demotion, wage cuts, a material loss of benefits, or "significantly

10  diminished material responsibilities." *Michael v. Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 594

11  (6th Cir. 2007).  "A change that is merely contrary to the employee's interests or not to the employee's

12  liking is insufficient" to constitute an adverse employment action. *Akers v. County of San Diego*, 95 Cal.

13  App. 4th 1441, 1455 (2002).

14  Mr. Gathenji fails to address defendants' argument that none of the allegations against Ms.

15  Renteria rise to the level of an adverse employment action.  Mr. Gathenji's opposition focuses on the

16  demotion, which undisputedly constitutes an adverse employment action.  Mr. Gathenji fails to rebut

17  defendants' supported position that no adverse employment action occurred after he was demoted in

18  June 2007.

19  None of the post-demotion actions constitutes an "adverse employment action" for the purposes

20  of Mr. Gathenji's discrimination claims.  Mr. Gathenji has not been demoted further and has retained

21  the terms, conditions, and privileges of his employment as a PSM since July 2007.  Mr. Gathenji remains

22  employed in the same position, he currently earns the top hourly rate that an employee in his position

23  can earn, and provides no evidence that the material responsibilities of his position have been

24  significantly diminished.  Accordingly, defendants successfully establish that Mr. Gathenji cannot

25  establish a necessary element of his prima facie case of discrimination based on any post-demotion

26  activities.

27  **Legitimate Reason for Actions**

28  In addition, defendants successfully establish that Ms. Renteria had legitimate reasons for the

complained of behaviors.  Mr. Gathenji failed to set forth evidence to dispute any of the evidence set forth by defendants to explain the legitimate reasons for the offending actions.  As set forth more fully above, Mr. Gathenji worked no more closing shifts and no more Saturday shifts than any other manager. Defendants submit undisputed evidence that all four of the other managers cleaned the windows at least once every two weeks and that other managers sometimes cleaned windows during the midday summer heat.  It is undisputed that Ms. Renteria posted information about the ASE test on the bulletin board for everyone to see.  Defendants submit undisputed evidence that Autozone does not provide training on the inventory matrix or the overstock system to any employee other than store managers and that Ms. Renteria did not train any of the PSMs in Mr. Gathenji's store on those systems.  It is also undisputed that Autozone maintains an attendance policy in which employees receive an attendance point for being tardy and that other PSMs received tardy attendance points.  Based on the foregoing, defendants establish a legitimate reason for the actions taken by Ms. Renteria.

### Pretext

Mr. Gathenji's post-demotion discrimination claims fail for the additional reason that he fails to establish pretext for the unfair treatment he claims under Ms. Renteria.  Defendants submit declarations by all three PSMs at Mr. Gathenji's store–including Ms. Dulan, who is also African-American–declaring that all PSMs were treated fairly by Ms. Renteria.  They all declare that they never witnessed Ms. Renteria's treating Mr. Gathenji unfairly.  Mr. Gathenji's argument regarding pretext is factually erroneous.  As set forth above, Mr. Gathenji incorrectly argues that Ms. Renteria called Mr. Gathenji the "N word."  Defendants establish that another employee used the racial slur, not Ms. Renteria.  Mr. Gathenji offers no further evidence to support his position of pretext.  Accordingly, Mr. Gathenji's discrimination claims based on the post-demotion activities fail as a matter of law.

### Failure to Prevent

Defendants' failure to prevent argument is based on their position that Mr. Gathenji's discrimination claims fail.  To the extent that Mr. Gathenji successfully opposed summary adjudication of his discrimination claims, defendants' argument fails.  While Mr. Gathenji may not pursue a failure to prevent claim based on his post-demotion allegations, Mr. Gathenji has established that triable issues of material fact exist on his discrimination claims related to his demotion, including failure to prevent.

1   Accordingly, defendants motion for summary adjudication in their favor on this cause of action is

2   granted in part and denied in part.

3                                          **Defamation**

4        To succeed on his defamation claims, Mr. Gathenji must establish that Ms. Renteria made "(a)

5   a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency

6   to injure or that causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).  Mr. Gathenji

7   alleges that Ms. Renteria defamed him by (1) accusing him of forging a document; and (2) accusing him

8   of sexual harassment.  The Court considers each of Mr. Gathenji's defamation claims separately.

9                                       **Forgery Comment**

10       Mr. Gathenji alleges that Ms. Renteria accused him of forging a document related to the alarm

11  system check.  Mr. Gathenji testified that on one occasion, he was unable to locate the folder on which

12  to write down the alarm system check code.  Instead, he wrote the code on the "opening managers

13  checklist."  A few days later when Mr. Gathenji located the folder, he copied the code into it.  Mr.

14  Gathenji alleges that Ms. Renteria, upon discovering the newly written code, called out to Mr. Gathenji

15  and asked, "Why are you forging stuff?"  Defendants contend that Mr. Gathenji's defamation claim fails

16  because he cannot establish that the comment was published.

17       Mr. Gathenji fails to rebut defendants' evidence that Ms. Renteria's alleged forgery accusation

18  was published.  "Publication is a term of art...For publication to occur the defamatory matter must be

19  communicated to a third party who understands the defamatory meaning and its applicability to the

20  plaintiff." *Cort v. St. Paul Fire & Marine Ins. Co.*, 311 F.3d 979, 985-86 (9th Cir. 2001) (quoting *Neary

21  v. Regents v. Univ. of Cal.*, 185 Ca. App. 3d 1136, 1147 (1986)) (internal quotations and ellipses

22  omitted).  Mr. Gathenji testified that he was "pretty sure" that Ms. Kniffen and Mr. Mota "would have"

23  heard this statement, because they "were closer to [Ms. Renteria] than [he] was."  According to Ms.

24  Kniffen and Mr. Mota, however, neither of them heard the statement or any statement in which Ms.

25  Renteria accused Mr. Gathenji of forgery.  Mr. Gathenji also "believe[s] there was [sic] one or two

26  customers" in the store at the time the comment was made, but offers no evidence to support this

27

28

speculation.[4]  Because Mr. Gathenji fails to raise a genuine issue of material fact as to whether the alleged forgery statement was published to a third party who understood the defamatory meaning and its applicability to him, Mr. Gathenji's defamation claim based on the alleged forgery statement fails as a matter of law.

**Office Gossip/Sexual Harassment**

Mr. Gathenji alleges that Ms. Renteria and Ms. Cuellar defamed him by falsely accusing him of sexual harassment.  In his deposition, Mr. Gathenji testified that Ms. Renteria and Ms. Cuellar falsely accused him of sexually harassing Ms. Renteria by falsely accusing him of starting a rumor that Ms. Renteria was involved romantically with Mr. Mota.  Mr. Gathenji contends that this accusation was untrue.  Mr. Gathenji claims that upon investigation, Ms. Cuellar found that Mr. Gathenji was not involved and informed Mr. Gathenji that the entire evening was a "misunderstanding."

According to the declarations of Ms. Renteria, Ms. Kniffen, Mr. Lopez, Mr. Irizzary, and Ms. Cuellar, the following took place: Ms. Kniffen, Mr. Lopez, and Mr. Irizzary told Ms. Renteria that Mr. Gathenji insinuated to them that Ms. Renteria was in a romantic relationship with Mr. Mota.  Ms. Renteria considered Mr. Gathenji's gossip to be inappropriate and to violate company policy.  She therefore informed Ms. Cuellar, the human resources manager, of what the employees told her and asked Ms. Cuellar to investigate.  Ms. Cuellar reviewed the company policy concerning gossip with Mr. Gathenji but did not discipline him in any way.

The parties' dispute whether Mr. Gathenji made the offending statement.  Defendants argue that because Ms. Renteria's statement to Ms. Cuellar that Mr. Gathenji gossiped about her was true, Mr. Gathenji's defamation claim fails as a matter of law.  Mr. Gathenji, however, points to his deposition testimony to dispute this fact.  He claims that made no statement to Ms. Kniffen, Mr. Lopez, and Mr. Irizzary and, therefore, the statement was false.  Because Mr. Gathenji raises a genuine issue of material fact as to the truthfulness of the statement, defendants' argument fails.

Defendants further contend that any statement Ms. Renteria made to Ms. Cuellar was privileged

---

[4]In response to defendants' separate statement of disputed facts, Mr. Gathenji claims that he self-published the statement reasonably to defend himself and to express his feelings at home.  This statement is unsupported factually and is not addressed legally in Mr. Gathenji's memorandum of points and authorities in opposition to defendants' summary judgment motion.  Accordingly, this Court rejects this unsupported statement.

1   because it was made within the context of an internal sexual harassment complaint.  Defendants argue

2   that the "mutual interest" privilege of California Civil Code section 47(c) bars Mr. Gathenji's claim.

3   California Civil Code section 47(c) "extends a conditional privilege against defamation to

4   communications made without malice on subjects of mutual interest."  *Bierbower v. FHP, Inc.*, 70 Cal.

5   App. 4th 1, 3 (1999).  This privilege "covers investigations of sexual harassment complaints by private

6   employers when made without malice."  *Id*.

7          The alleged communication between Ms. Renteria and Ms. Cuellar falls within this privilege.

8   An accusation of workplace harassment is a privileged mutual interest communication because

9   "employers and employees both have a common interest in preventing and correcting sexual

10  harassment."  *Id*. (citing *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380 (5th Cir. 1987).

11  "[B]ecause any given interaction between any two people at the same workplace carries at least the

12  *danger* of a sexual harassment lawsuit, the matter is necessarily of 'mutual interest' under Civil Code

13  section 47, subdivision (c)."  *Bierbower*, 70 Cal. App. 4th at 3 (emphasis in original).

14         The conditional privilege is applicable only if the alleged defamatory statement was made

15  "without malice."  Malice may be established by "a showing that the publication was motivated by

16  hatred or ill will toward the plaintiff or by a showing that the defendant lacked reasonable grounds for

17  belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights."

18  *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1213 (1994).  Mr. Gathenji bears the burden to establish that Ms.

19  Renteria acted maliciously in making the alleged defamatory statement. *Id*.

20         Defendants argue that Mr. Gathenji cannot raise a triable issue as to malice.  Defendants contend

21  that company policy required Ms. Renteria to pass on the complaints made to her by her employees to

22  human resources and that the only time she made the alleged statement was to Ms. Cuellar in the context

23  of reporting the alleged sexual harassment.  In addition, defendants point out that three employees have

24  declared that they told Ms. Renteria that Mr. Gathenji insinuated that she was in a relationship with Mr.

25  Mota.  Based on these declarations, defendants submit that Ms. Renteria had reasonable grounds to

26  believe in the truth of the publication.

27         Mr. Gathenji correctly notes that the privileged communication must be made without malice,

28  but points to no evidence to support his position that Ms. Renteria made the comment with actual

26

malice.  Mr. Gathenji questions whether the three witnesses told Mr. Renteria that he was gossiping about her.  His speculation, however, is insufficient to rebut the declarations of Ms. Renteria, Ms. Kniffen, Mr. Lopez, Mr. Irizzary, and Ms. Cuellar.  Mr. Gathenji lacks personal knowledge as to what statements were made to Ms. Renteria.  Because Mr. Gathenji fails to provide specific evidence to raise a triable issue of fact as to malice, the statement falls within the California Civil Code section 47(c) "mutual interest" privilege.  Because defendants' successfully establish that the statement was privileged, Mr. Gathenji's defamation claim as to the alleged sexual harassment allegation fails as a matter of law.

### CONCLUSION

For the foregoing reasons, this Court:

1.    GRANTS summary adjudication in favor of defendants and against Mr. Gathenji on Mr. Gathenji's claims for:

    a.    defamation;

    b.    discrimination based on allegations related to activities that occurred after his demotion, including those allegations involving Ms. Renteria;

    c.    failure to prevent based on allegations related to activities that occurred after his demotion, including those allegations involving Ms. Renteria; and

2.    DENIES summary adjudication as to Mr. Gathenji's discrimination and failure to prevent discrimination claims to the extent that these claims are based on Mr. Gathenji's allegations related to his demotion and his alleged disparate treatment by Mr. Torres.

IT IS SO ORDERED.

**Dated:    April 29, 2011**              /s/ Lawrence J. O'Neill
                                          UNITED STATES DISTRICT JUDGE